**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KATHY HENDERSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, *et al.*,<br><br>*Defendants.* | Civil Action No. 24-31(RDM) |

**MEMORANDUM OPINION**

This case involves two alleged assaults on Plaintiff Kathy Henderson, both of which occurred on December 26, 2020. The first assault occurred while Henderson was a passenger on a Washington Metropolitan Area Transit Authority ("WMATA") bus, and the second occurred when she sought medical assistance at MedStar Washington Hospital Center ("MedStar") for the injuries she sustained due to the first assault. In her amended complaint, Henderson asserts claims against WMATA and MedStar for negligent supervision of their employees and for negligent infliction of emotional distress, and she brings additional claims against MedStar for violating Title VI of the Civil Rights Act of 1964, for negligent hiring and retention, and for intentional infliction of emotional distress. She has not brought suit against either alleged assailant. Pending before the Court is each Defendant's motion to dismiss. Dkts. 26 & 27.

For the reasons explained below, the Court will **GRANT** both motions to dismiss.

## I. BACKGROUND

The following factual allegations are taken from Plaintiff's amended complaint, Dkt. 23 (Am. Compl.), which the Court accepts as true for the purpose of resolving the pending motions to dismiss. *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 163–64 (D.C. Cir. 2015).

On December 26, 2020, Plaintiff was a passenger on WMATA's X2 Metrobus, traveling through Northwest Washington, D.C. Dkt. 23 at 4 (Am. Compl. ¶ 14). While Plaintiff sat alone on the bus, a fellow passenger ("Assailant") "aggressively approached," "demanded to sit in the open seat beside[] her[,] and then forcibly inserted himself into the space." *Id.* "Approximately three other passengers encouraged [the] Assailant . . . to take [her] belongings." *Id*. The Assailant then "proceeded to create a loud disturbance, using profanity and directing derogatory, offensive language at Plaintiff, while the other passengers loudly egged him on." *Id.*

Plaintiff left her seat, approached the bus operator, Donald Blue, and "urgently requested that he call the police." *Id*. at 5 (Am. Compl. ¶ 15). Plaintiff "also retrieved her cellphone to summon law enforcement herself." *Id.* "Despite her pleas," Blue "remained unresponsive" and did not "call the police, activate the emergency alarm, or take required action[] to signal for help." *Id.* The Assailant then "left his seat and aggressively advanced" toward Plaintiff and "punched, kicked, and forcibly grabbed [Plaintiff's] bags." *Id.* (Am. Compl. ¶ 16). Plaintiff "struggled to defend herself but was quickly overpowered." *Id*. During the alleged assault, Blue "opened the bus doors," and, "[a]s the attack continued, Plaintiff was pushed off the bus." *Id.* "The bus was stopped at the X2 bus stop [near] 99 H Street NW when Metro Police and Metro Field Operations Supervisor Amit Tonse arrived at the scene." *Id.* (Am. Compl. ¶ 17).

Plaintiff was then transported by ambulance to MedStar's emergency room. *Id*. (Am. Compl. ¶ 19). While Plaintiff waited for medical attention, Metro Police Detective Brian

Minson came to the emergency room to take her witness statement. *Id*. (Am. Compl. ¶ 20). A nurse escorted them to a private room for the interview. *Id.* at 5–6 (Am. Compl. ¶ 20). After they were done, Plaintiff remained in the private room, awaiting medical attention. *Id*. at 6 (Am. Compl. ¶ 21). A MedStar security guard, B. Dzieketey, who "appeared visibly agitated, hostile, angry and otherwise appeared to be on amphetamines or some other illegal drug," entered the private room and "aggressively demanded to know why [Plaintiff] was there." *Id*. Dzieketey "shouted at Plaintiff to 'get out,' then forcibly grabbed her by the collar," "dragged her through the emergency room," and "violently shoved her out of the facility." *Id*. (Am. Compl. ¶ 22).

Plaintiff alleges that, although she "suffered additional harm from [Dzieketey's] unprovoked attack, . . . she managed to call 911 . . . to report the unjustified, unprovoked, and excessive assault by Officer/Guard B. Dzieketey." *Id*. (Am. Compl. ¶¶ 22–23). "When officers finally arrived, Dzieketey attempted to justify his actions by claiming that Plaintiff should not have been in the room." *Id.* (Am. Compl.¶ 23). Adding insult to injury, Dzieketey's supervisor, a "hospital security sergeant, then issued Plaintiff a five-year Barring Notice" from the facility. *Id*. (Am. Compl. ¶ 24). Plaintiff alleges that "[b]oth . . . Dzieketey and his supervisor were fully aware that Plaintiff had been violently assaulted on a Metro bus, transported by ambulance to the emergency room, and was awaiting medical evaluation at the time of the incident." *Id.* at 6–7 (Am. Compl. ¶ 24). Plaintiff did not receive a medical evaluation or any medical treatment for the injuries she sustained during the bus incident. *Id*. at 7 (Am. Compl. ¶ 25).

Initially proceeding *pro se*, Plaintiff brought this action against WMATA and MedStar on December 26, 2023 in D.C. Superior Court. Dkt. 1-1. WMATA timely removed, Dkt. 1, and answered the initial complaint, Dkt. 3. Plaintiff then acquired counsel. Dkt. 8. Shortly thereafter, MedStar moved to dismiss. Dkt. 12. At a hearing on MedStar's motion to dismiss,

the Court granted MedStar's motion without prejudice and granted Plaintiff leave to amend her complaint. *See* Dkt. 24. On March 30, 2025, Plaintiff filed an amended complaint, asserting claims of negligent supervision and negligent infliction of emotional distress ("NIED") against both WMATA and MedStar and asserting additional claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and of negligent hiring and retention and intentional infliction of emotional distress ("IIED") against MedStar. *See* Dkt. 23 at 8–16 (Am. Compl. ¶¶ 29–75). Plaintiff seeks $2,000,000 in compensatory and punitive damages, as well as attorney's fees and costs. *Id*. at 3, 7, 17–19 (Am. Compl. ¶¶ 5, 27, Prayer).

Both WMATA and MedStar have now moved to dismiss the amended complaint, Dkts. 26 & 27, and Plaintiff has opposed both motions, Dkts. 28 & 34.

## II. LEGAL STANDARD

"Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Blackwood of DC, LLC v. Internal Revenue Serv.*, No. 23-cv-7, 2024 WL 5044606, at *2 (D.D.C. Sept. 11, 2024). The Court must dismiss any claim over which it lacks subject-matter jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506–07 (2006).

WMATA's claim of sovereign immunity as to the negligent supervision claim, Dkt. 26-1 at 3–4, implicates the Court's subject matter jurisdiction, not just whether the Plaintiff has stated a claim upon which relief can be granted, *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) ("Sovereign immunity claims are jurisdictional."). Accordingly, even though WMATA asserts that its motion is brought "[p]ursuant to Federal Rule of Civil Procedure 12(b)(6)," *see*

Dkt. 26-1 at 2, the motion is, at least in part, properly evaluated under Rule 12(b)(1), *Whiteru v. WMATA*, 258 F. Supp. 3d 175, 181–82 (D.D.C. 2017).

WMATA's claim of sovereign immunity raises a "facial" challenge to the Court's jurisdiction. *Afanasieva v. WMATA*, 588 F. Supp. 3d 99, 105 (D.D.C. 2022). "A facial challenge to the Court's jurisdiction contests the legal sufficiency of the jurisdictional allegations contained in the complaint." *Id.* (citation modified). To resolve a facial challenge, the Court "accepts all well-pleaded factual allegations as true and draws all reasonable inferences from those allegations in the plaintiff's favor" but does not "assume the truth of legal conclusions." *Id.* (citation modified) (quoting *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016)).

MedStar's motion and the remainder of WMATA's motion are properly considered under Rule 12(b)(6), which "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *see* Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion, the Court "must first 'take note of the elements a plaintiff must plead to state the claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (citation modified) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). The complaint need not include "detailed factual allegations," and a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citation modified). The Court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial

notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

## III. ANALYSIS

### A. Claims Against WMATA

#### 1. *Negligent Supervision*

WMATA first argues that Plaintiff's negligent supervision claim is barred by Eleventh Amendment sovereign immunity. Dkt. 26-1 at 3–4. The Court agrees and will dismiss that claim for lack of jurisdiction.

When Maryland, Virginia, and the District of Columbia entered the WMATA Compact, they "conferred upon WMATA their respective sovereign immunities." *Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C. Cir. 1997). Section 80 of the Compact "waives this immunity for torts 'committed in the conduct of any proprietary function,' while retaining immunity for torts committed by [WMATA's] agents 'in the performance of a governmental function.'" *Id.* (quoting D.C. Code § 9–1107.01(80)). "The D.C. Circuit has held that the question of whether [a particular] function in question is governmental or proprietary under Section 80 is one of federal law, and [it] has developed two alternative tests for identifying governmental functions under the WMATA Compact." *Turner v. WMATA*, 701 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (citation modified). Under the first test, the Court considers whether "[the] activity is a quintessential governmental function, such as police activity, [in which case] it is within the scope of WMATA's sovereign immunity." *Id.* at 68 (citation modified) (quoting *Burkhart*, 112 F.3d at 1216). If the activity is not a quintessential governmental function, the Court must go on to the alternative test and consider whether the activity is "discretionary," and thus "shielded by sovereign immunity," or "ministerial," and thus subject to the waiver set forth in the Compact. *Id.* (quoting *Burkhart*, 112 F.3d at 1216). Discretionary duties "involve judgment, planning, or

policy decisions," whereas ministerial duties "involve enforcement or administration of a mandatory duty at the *operational level*, even if professional expert evaluation is required." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1138 (D.C. Cir. 2015) (emphasis in original) (citation modified).

In determining whether a duty is discretionary or ministerial, the Court must, in turn, apply a separate two-part test. First, the Court must consider whether "any statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* (citation modified). "If the tort claim arises from a WMATA employee's failure to act as the law specifically prescribes, the conduct is not shielded by immunity." *Id.* "If the law leaves the conduct in question to the official's discretion," the Court must then consider "whether the exercise of discretion is grounded in social, economic, or political goals." *Id.* (citation modified). Of particular relevance here, the D.C. Circuit has held that "decisions concerning the hiring, training, and supervising of WMATA employees are discretionary in nature, and thus immune from judicial review." *Burkhart*, 112 F.3d at 1217; *see also Jones v. WMATA*, 205 F.3d 428, 432 (D.C. Cir. 2000). Because "supervision decisions involve a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety," they are decisions that "involve the exercise of . . . judgment," and fall within WMATA's discretionary functions. *Burkhart*, 112 F.3d at 1217.

Here, WMATA contends that Plaintiff's negligent supervision claim is foreclosed by *Burkhart*. Dkt. 26-1 at 3. To the extent that Plaintiff's negligent supervision claim rests on the perceived deficiencies and shortcomings in WMATA's training or supervision of Blue, "a straightforward application of *Burkhart* compels dismissing Plaintiff's negligent . . . supervision cause of action." *Davis v. WMATA*, No. 19-cv-660, 2019 WL 2343670, at *2 (D.D.C. June 3,

2019). Plaintiff has identified no "statute, regulation, or policy specifically prescrib[ing]" certain minimum training or supervision with regard to Metrobus emergency protocols that WMATA must provide to its employees. *Banneker Ventures, LLC*, 798 F.3d at 1138 (citation modified); *see also Burkhart*, 112 F.3d at 1217 (noting plaintiff has failed to identify "law or policy specifically prescribing guidelines for the hiring, training, or supervision of WMATA employees." (citation modified)). The Compact permits WMATA to "provide for the qualification, appointment, [and] removal" of employees, D.C. Code § 9-1107.01(12)(g), and to "[c]ontrol and regulate . . . the service to be rendered," *Burkhart*, 112 F.3d at 1217 (quoting D.C. Code § 9-1107.01(12)(j)). The complaint includes no basis to doubt that WMATA was exercising its discretion and balancing competing policy prerogatives in setting the requisite qualifications and training for Metrobus operation and in deeming Blue sufficiently trained in emergency protocols. As the *Burkhart* Court explained, "*[t]he extent of training* with which to provide employees requires consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from accepted norms in the past." *Id.* (emphasis added).

Although Plaintiff captions her claim as one of negligent supervision, her briefing appears to confuse her negligent supervision claim and a claim (which she has not brought) alleging vicarious liability for Blue's negligent actions or omissions. Her complaint, for example, alleges that "WMATA negligently supervised Metro bus driver Donald Blue, who failed to take any reasonable action to protect Plaintiff from a violent assault." Dkt. 23 at 8 (Am. Compl. ¶ 32). Her opposition brief starts in a similar vein, arguing that WMATA is liable for Blue's "failure to execute mandatory duties in an emergency situation," which she characterizes as "an operational lapse that directly endangered Plaintiff's safety." Dkt. 28 at 3–4. But Plaintiff

also shifts the focus from a theory of vicarious liability for *Blue's* negligence to a negligent supervision claim that "targets *WMATA*'s failure to implement and carry out . . . supervisory duties in practice" and is about "[s]upervisory decisions involving routine operational tasks—such as monitoring employees or removing them based on known safety risks [which] are ministerial, not discretionary." *Id.* at 3 (emphasis added). And she further reads this Court's decision in *Afanasieva v. Washington Metropolitan Area Transit Authority*, 588 F. Supp. 3d 99 (D.D.C. 2022), as "reject[ing] WMATA's sovereign immunity defense in a similar context" and as permitting claims for "negligent execution of day-to-day functions that are ministerial in nature," Dkt. 28 at 3.

*Afanasieva* helps illustrate Plaintiff's confusion. In *Afanasieva*, this Court considered a similar *factual* context: a WMATA bus driver's failure to intervene or protect the plaintiff-passenger from a third-party assailant. 588 F. Supp. 3d at 103–05. There, however, the Court considered only an ordinary negligence claim based on a theory of *respondeat superior* liability for the driver's failure to intervene in the assault, not a claim about WMATA's negligence in training or supervising the driver. *See id.* at 108; *see also Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759–60 (D.C. 2001) (noting that "[u]nder [a] negligent supervision theory, [defendant's] duty to supervise is not merely to be judged by the concept of *respondeat superior*, . . . [but] is an allegation of direct negligence" (citation modified)). In that context, the Court held that the plaintiff's negligence claim implicated neither (1) a quintessential governmental function, *i.e.*, police activity, because it challenged only the bus driver's failure "to *summon* the police by means available to her and in which she had been instructed," nor (2) "discretionary decision-making," because plaintiffs "base[d] their negligence claims on the bus driver's alleged failure to comply with WMATA policies" mandating "that the bus driver

instruct a disruptive passenger to stop any offending conduct" and "activate the silent alarm if he or she observes threats of bodily harm." *Afanasieva*, 588 F. Supp. 3d at 108–09 (citation modified) (emphasis in original). In holding that sovereign immunity did not bar that negligence claim, the Court rejected any theory of negligence based on "WMATA's general responsibility to prevent and investigate incidents on its bus routes through the use of its police force and through discretionary decisions about resource allocation and policy," as these decisions "implicate WMATA's 'governmental functions' and thus are barred by sovereign immunity." *Id.* at 109–10 (citation modified).

For these reasons, *Afanasieva* does not help Plaintiff avoid WMATA's sovereign immunity with respect to the principal claim that she alleges against it: "Negligent Supervision." Dkt. 23 at 8–9 (Am. Compl. ¶¶ 29–38). To be sure, Plaintiff's factual averments might (or might not) support a *respondeat superior* claim against WMATA based on Blue's alleged negligence. But the Court declines to address a hypothetical claim that Plaintiff has not brought, *see Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.), Inc.*, 263 F. Supp. 2d 140, 148 (D. Mass. 2003) ("while the allegations of the complaint are construed favorably to the plaintiff, the court will not read causes of action into the complaint which are not alleged"), and that, as a result, WMATA has not had an opportunity to address.

Because Plaintiff has failed to identify any policy requiring WMATA to train and to supervise Blue in the use or deployment of emergency protocols and because decisions within this circuit have consistently held that claims challenging WMATA's hiring, supervision, and training decisions fall within the scope of WMATA's sovereign immunity, *Davis*, 2019 WL 2343670, at *2 ("Plaintiff['s] claim[] that WMATA should not have put the driver on the road because it knew she was not qualified or adequately trained to operate a bus . . . lie[s] beyond the

reach of common law torts."); *Turner*, 701 F. Supp. 2d at 71; *see also Hamilton v. United States*, No. 19-cv-1105, 2021 WL 2809124, at *5 (D.D.C. July 6, 2021) ("Clear D.C. Circuit precedent establishes that hiring, training, and supervision choices are susceptible to policy judgment." (citation modified) (quoting *Burkhart*, 112 F.3d at 1217)), Plaintiff's negligent supervision claim against WMATA fails for want of jurisdiction.

2. *Negligent Infliction of Emotional Distress*

The Court next considers Plaintiff's sole remaining claim against WMATA, which seeks to assert a claim for NIED. "Under District of Columbia law, a plaintiff may recover for [NIED] under two tests." *Lacy v. Ortega*, No. 22-cv-00558, 2023 WL 11199602, at *6 (D.D.C. Jan. 9, 2023) (quoting *Lesesne v. District of Columbia*, 146 F. Supp. 3d 190, 195 (D.D.C. 2015)). One avenue for recovery is the "zone of danger" test, which allows a plaintiff to recover "for mental distress if the defendant's actions caused the plaintiff to be 'in danger of physical injury' and if, as a result, the plaintiff 'feared for [her] own safety.'" *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C. 2011) (en banc); *Lacy*, 2023 WL 11199602, at *6. Neither party argues that this standard is applicable here, *see* Dkt. 26-1 at 4–5; Dkt. 28 at 5, and the Court will, accordingly, focus its analysis on whether Plaintiff has pled a plausible claim under the second test, the "special relationship" test, *see, e.g.*, *Lamb v. United States*, No. 21-cv-3000, 2022 WL 2966337, at *8 (D.D.C. July 26, 2022).

Under the "special relationship" test, an NIED plaintiff must allege that

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Hedgepeth*, 22 A.3d at 810–11. Plaintiff's emotional distress must be serious and verifiable *Id.* at 817 (citation modified). It must, in other words, "be acute, enduring or life-altering." *Id.*

WMATA does not dispute that it is a common carrier and that it owes its passengers a duty to protect them from foreseeable harm. Dkt. 26-1 at 4–5; *see WMATA v. O'Neill*, 633 A.2d 834, 840 (D.C. 1993) ("[B]etween a common carrier and its passengers," "a special relationship exists," under which the "carrier undeniably has a duty to protect its passengers from foreseeable harm arising from criminal conduct of others."). WMATA, instead, argues that Plaintiff has not adequately alleged that the harm she allegedly suffered was foreseeable to the bus driver; that it was caused by the bus driver's actions or omissions; or that she sustained a serious and verifiable emotional injury that has "manifested [in] an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state." Dkt. 26-1 at 5–7 (quoting *Jones*, 589 A.2d at 424).

The Court need not address WMATA's arguments regarding the negligence elements, because Plaintiff has failed to plead facts sufficient to support a "serious and verifiable" emotional injury. A NIED plaintiff is not required to allege that the negligent act at issue caused some physical impact or physical injury. *Hedgepeth*, 22 A.3d at 796–97. But she must allege facts supporting a "serious and verifiable" emotional injury that is "acute, enduring or life-altering," *id.* at 817 (citation modified), and that has "manifested in an external condition or physical symptoms," *Wells v. Hense*, 235 F. Supp. 3d 1, 14 (D.D.C. 2017) (quoting *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011)); *Hawkins v. WMATA*, 311 F. Supp. 3d 94, 107 (D.D.C. 2018) (same); *Cobb v. WMATA*, No. 20-cv-3522, 2021 WL 2935891, at *5 (D.D.C. July 13, 2021) (same); *see also Thompson v. Trump*, 590 F. Supp. 3d 46, 122 (D.D.C.

2022) ("Serious and verifiable distress for NIED . . . must manifest in some concrete way." (citation modified)), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023).

Here, Plaintiff's allegations are too conclusory to satisfy the *Hedgepeth* rule. Plaintiff refers to "anxiety, fear, and humiliation," "[p]sychological trauma and emotional suffering," "[o]ngoing distress and apprehension, about seeking medical treatment or using public transportation," and "[a]ggravation of Plaintiff's life-threatening chronic health condition, which is exacerbated by extreme stress," Dkt. 23 at 16 (Am. Compl. ¶ 72), which "risks multiple organ failure," *id.* at 7 (Am. Compl. ¶ 28). Beyond these conclusory assertions, Plaintiff says nothing about how her alleged emotional injury has manifested itself in some concrete and serious manner. *See Hawkins*, 311 F. Supp. 3d at 107–08. She fails to allege, for example, what "life-threatening chronic health condition" was aggravated by the "extreme stress" caused by WMATA's alleged misconduct, much less how—specifically—that aggravation manifested itself. The letter from Plaintiff's doctor, which she attaches to her response, fares no better. *See* Dkt. 34-1 at 1. That letter repeats Plaintiff's vague assertions of "a life-threatening illness;" notes Plaintiff's "pain, debilitating fatigue and other symptoms;" and states that "[f]lare-ups are aggravated by stress" and that Plaintiff "is at significant risk for multiple organ failure." *Id.* The letter makes no reference to the alleged WMATA assault or any consequent physical manifestations of emotional distress. Nor could it: the letter is dated November 30, 2017—more than three years prior to the alleged assault. *Id.*

Instead, Plaintiff's unadorned assertions of ongoing distress, fear, humiliation, and trauma resemble similar allegations deemed insufficient in the past. *Hawkins*, 311 F. Supp. 3d at 108 ("vague allegations about the plaintiffs' fear," and "emotional and psychological trauma" are insufficient to state a claim); *Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 & n.3 (D.C. 2016)

(claims of "disappointment," "hurt," being "emotionally traumatized," and feeling humiliated insufficient to be "serious and verifiable"); *contra Cobb*, 2021 WL 2935891, at *5 ("insomnia, which requires ongoing medical treatment," "persistent recurring nightmares, and acute anxiety" sufficient to satisfy emotional distress element).

The Court will, accordingly, dismiss Plaintiff's NIED claim against WMATA.

### B. Claims Against MedStar

The Court next considers Plaintiff's claims against MedStar.

#### 1. *Statute of Limitations and Relation Back for Title VI, NIED, and IIED*

The Court starts with MedStar's arguments about the statute of limitations and the relation back doctrine. Plaintiff's amended complaint asserts new claims under Title VI and the common law causes of action for IIED and NIED. Although the Court declines to dismiss Plaintiff's Title VI and NIED claims on statute of limitations or relation back grounds, Plaintiff's IIED claim is time barred by the applicable statute of limitations for assault.

As an initial matter, MedStar contends that all three claims should be dismissed because Plaintiff's counsel failed to identify these claims as the ones that she intended to add to her amended complaint when asked by this Court during a motions hearing on the prior motion to dismiss. Dkt. 27-1 at 3–4; *see* Dkt. 24 at 5. MedStar maintains that although the Court permitted Plaintiff to amend her complaint, "Plaintiff should be barred from raising these new claims because she did not do so at the hearing or at any other time after the motion to dismiss was filed." Dkt. 27-1 at 4. That misunderstands what the Court did. The Court did not limit Plaintiff's amendment to claims regarding supervision and training. *See* Min. Entry (Mar. 20, 2025). The Court simply granted leave to amend. Against that backdrop, MedStar fails to cite any authority permitting, much less requiring, the Court to dismiss with prejudice or to decline to consider a claim included in an otherwise proper amended complaint, simply because counsel

did not identify that claim when seeking leave to amend. In any event, Rule 15 requires courts to grant leave to amend liberally, and, here, MedStar fails to identify any cognizable prejudice it would suffer—or has suffered—by reason of Plaintiff's amendment.

Second, MedStar contends that the claims are time barred and do not "relate back" to the original claims. Dkt. 27-1 at 4. The Court must address this defense on a claim-by-claim basis.

The Court begins with the Title VI claim. Plaintiff claims that MedStar, which receives federal funding, violated Title VI when Dzieketey "forcibly removed [Plaintiff] from the hospital without receiving any medical evaluation or treatment." Dkt. 23 at 10 (Am. Compl. ¶¶ 41, 45). In this Circuit, Title VI claims of discrimination are subject to a three-year statute of limitations. *See Stafford v. George Washington Univ.*, 56 F.4th 50, 53 (D.C. Cir. 2022); D.C. Code § 12-301(8) (residual statute of limitations for claims "for which a limitation is not otherwise specially prescribed"). MedStar is correct that this claim, which was raised for the first time in Plaintiff's amended complaint filed on March 30, 2025, and which challenges conduct that occurred on December 26, 2020, was first brought more than three years after the alleged tort took place. Dkt. 27-1 at 4. Plaintiff, however, filed her original *pro se* complaint in D.C. Superior Court—prior to WMATA's removal of the action to this Court—on December 26, 2023, Dkt. 1-1 at 1, just barely within the three-year statute of limitations. In order to be timely, then, Plaintiff's Title VI claim must relate back to the allegations in Plaintiff's original complaint.

Rule 15 provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). The relation-back doctrine "permits the assertion of new claims so long as the factual underpinnings of the new claim appeared in the earlier pleading."

*Cabrera v. Black & Veatch Special Project Corp.*, No. 19-cv-3833, 2024 WL 1435146, at *6 (D.D.C. Mar. 28, 2024) (citation modified). In contrast, the doctrine does not apply when the amended pleading (1) "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth," or (2) "fault[s] the defendants for conduct different from that identified in the original complaint." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 881 (D.C. Cir. 2010) (citation modified) (second quoting *Jones v. Bernanke*, 557 F.3d 670, 674 (2009)). "To determine whether a claim arises out of the same transaction or occurrence, courts examine, among other considerations, whether the claim involves the same parties, the same agreements, the same evidence, or whether it could give rise to an irreconcilable judgment." *Blue v. Fremont Inv. & Loan*, 562 F. Supp. 2d 33, 41 (D.D.C. 2008).

Here, there is no question that the Title VI claim involves the same parties. Accordingly, the central question is whether Plaintiff's Title VI claim arises out of the alleged assault that she suffered at the MedStar Washington Hospital Center at the hands of Dzieketey and the five-year barring notice issued by Dzieketey's supervisor. MedStar concedes that it does and, indeed, acknowledges that all of Plaintiff's new claims arise out of the same December 26, 2020 hospital assault by Dzieketey that forms the substance of Plaintiff's allegations against MedStar in her original, *pro se* complaint, *see* Dkt. 1-1 at 2–3 (Compl. ¶¶ 4–6). Dkt. 27-1 at 4. The fact that Plaintiff's original complaint did not mention any discriminatory motive does not change the nature of the challenged conduct. Plaintiff's amended complaint simply invokes Title VI as a new *basis* for challenging the *same* conduct. On these facts, Plaintiff's Title VI claim arises out of the same transaction and occurrence and is thus timely.

The Court, accordingly, will consider Plaintiff's Title VI claim on the merits.

Plaintiff's NIED claim also "relates back" to her original complaint. A negligence or NIED claim in an amended complaint is "barred by the one-year statute of limitations [if] it states, in substance, claims for intentional torts, while characterizing them as negligence." *Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006). "[T]he same course of conduct may support both a claim of assault and battery and a claim of negligence, provided that it is established that the defendant, in the process of engaging in the conduct that included the intentional tort, was also breaching another recognized duty owed the plaintiff." *McCracken v. Walls-Kaufman*, 717 A.2d 346, 351 (D.C. 1998). Accordingly, if a negligence claim involves use of force by an officer, "that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." *District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003). The "trial court is not bound by a plaintiff's characterization of an action and . . . use of the terms 'carelessly and negligently,' without more, are conclusory and do not raise a cognizable claim of negligence." *Id.* at 708.

At a hearing on MedStar's previous motion to dismiss, Dkt. 12, Plaintiff's counsel conceded that any assault claim against MedStar is time barred under D.C. Code § 12-301(4), and this Court granted MedStar's motion without prejudice on that basis, Dkt. 24 at 4–5. The Court cautioned that to the extent that the basis of a negligence claim in any future amended complaint is the alleged assault by Dzieketey, "the statute of limitations can't be avoided by simply calling that negligence." *Id.* at 5.

MedStar now suggests that "Plaintiff['s] [NIED claim] attempts an end run around the statute of limitations issue" because "[t]he only active conduct alleged in Plaintiff's complaint is intentional—Plaintiff's removal from the hospital—and thus barred." Dkt. 27-1 at 11.

Plaintiff's NIED claim, however, does not merely dress up the now-dismissed assault claim in the garb of negligence by describing Dzieketey's alleged assault as negligent or careless. Plaintiff's NIED claim is not based on a purported breach of Dzieketey's duty to refrain from using excessive force. Instead, the claim is premised on a purported breach of MedStar's duty to its patients by: "(a) [a]llowing security personnel to use excessive force against a vulnerable patient without justification or accountability; (b) [f]ailing to ensure that security personnel followed hospital policies and respected patient rights, including the right to emergency medical treatment; and (c) [b]arring Plaintiff from the hospital for five years, depriving her of access to necessary medical care." Dkt. 23 at 15–16 (Am. Compl. ¶ 70). In other words, Plaintiff's NIED claim presents an alternative theory of negligence to her negligent hiring, supervision, and retention claims, which is permissible at this stage. *See* Fed. R. Civ. P. 8(d)(2)–(3); *see also* *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 109 (D.D.C. 2011) ("The plaintiff has posited several distinct theories of negligence liability, as he is entitled to do, based on at least two alternative factual scenarios."). Although she cannot prevail on a *respondeat superior* theory, which she has not pled and could not pursue in light of the one-year statute of limitations, nothing precludes her from asserting a separate claim that focuses on MedStar's asserted negligence.

Because Plaintiff's NIED claim is thus governed by the ordinary three-year statute of limitations, *see Stafford v. George Washington Univ.*, No. 18-cv-2789, 2019 WL 2373332, at *19 (D.D.C. June 5, 2019), and because, for the reasons explained above, Plaintiff's NIED claim arises from the same transactions and occurrences in her original pleading, Plaintiff's NIED claim relates back to her original complaint and is timely.

A similar principle governs Plaintiff's IIED claim, although it leads to a different outcome. Plaintiff's IIED claim must be dismissed because it, in substance, alleges assault, which was untimely even at the time of Plaintiff's first complaint. Under D.C. law, "[f]or [IIED], the applicable statute of limitations is properly determined by the nature of the underlying acts." *Saunders v. Nemati*, 580 A.2d 660, 661 (D.C. 1990). If, on the one hand, a plaintiff's IIED claim "is . . . completely dependent upon and intertwined with" other intentional torts subject to a one-year statute of limitations, the one-year statute of limitations applies to the IIED claim as well. *Id.* at 662 (citation modified). If, on the other hand, "an independent action for [IIED], [does] not intertwine[] with any of the causes of action for which a period of limitation is specifically provided in the other provisions of section 12-301, [then it] is governed by the general residuary three-year limitation of section 12-301(8)." *Id.* at 665. In other words, Plaintiff cannot repurpose a time-barred assault claim as an IIED claim simply to invoke a more generous statute of limitations. *Zhi Chen v. Monk*, 701 F. Supp. 2d 32, 36–37 (D.D.C. 2010). But that is exactly what Plaintiff has done.

Plaintiff's IIED claim is "completely dependent upon and intertwined with" her now-dismissed assault claim against MedStar. *Saunders*, 580 A.2d at 662 (citation modified). She asserts that "[o]n December 26, 2020, Plaintiff was subjected to extreme and outrageous conduct by . . . Officer/Guard B. Dzieketey and other hospital staff," including the "force[ful] and aggressive[] remov[al] [of] Plaintiff from the emergency room," the "[u]se[] [of] physical force to drag Plaintiff out of the facility," Dzieketey's "[s]hout[ing]" at and "humiliat[ion] [of] her," and the denial of medical treatment. Dkt. 23 at 13–14 (Am. Compl. ¶ 62). Plaintiff's claim is premised entirely on Dzieketey's alleged assault and abrasive conduct. It is, accordingly, barred by the one-year statute of limitations for assault. *See Tafler v. District of Columbia*, No. 05-cv-

1563, 2006 WL 3254491, at *8 (D.D.C. Nov. 8, 2006) (finding that the plaintiff's claim for IIED was time barred because he "failed to allege any facts to suggest that his emotional distress was caused by conduct independent of the alleged assault and battery . . . which have a one-year statute of limitations").

Plaintiff contends, in her opposition to MedStar's motion to dismiss, that her IIED claim is premised on the fact that MedStar "later imposed a retaliatory five-year ban, effectively depriving her of access to necessary medical care," and MedStar's "failure to investigate the incident, and its apparent institutional indifference to Plaintiff's physical and emotional well-being." Dkt. 34 at 10. Plaintiff contends that these acts form "a separate and continuing course of conduct that plausibly supports a distinct claim for [IIED]." *Id.* But Plaintiff mischaracterizes her amended complaint: the gravamen of her IIED claim focuses on Dzieketey's use of physical force, Dkt. 23 at 13–14 (Am. Compl. ¶ 62), and the complaint does not even mention MedStar's failure to investigate the incident. And although the amended complaint does refer to MedStar's "[r]efus[al] to provide medical treatment or even inquire about Plaintiff's well-being," *id.* at 14 (Am. Compl. ¶ 62), these actions or inactions cannot be characterized as "separate" and "distinct" from the assault in light of Plaintiff's own allegations. MedStar's five-year barring notice and refusal to provide medical care came on the heels of, and was incidental to, Dzieketey's alleged forceful removal of Plaintiff from the hospital due to his (perhaps mistaken) belief that she was trespassing, *id.* at 6–7 (Am. Compl. ¶¶ 21–25). Indeed, without the alleged assault, Plaintiff's challenge to the five-year barring notice could not plausibly clear the high hurdle of pleading a claim for IIED, which requires "extreme and outrageous" misconduct. *Smith v. Clinton*, 886 F.3d 122, 129 (D.C. Cir. 2018). As a result, the alleged assault and barring

notice "rest[] on" and are "essentially an outgrowth of the other pleaded [and untimely] torts," *Saunders*, 580 A.2d at 662.

The Court, accordingly, concludes that Plaintiff's IIED claim is barred by the one-year statute of limitations for assault.

2. *Title VI*

Turning to the merits, the Court first considers the legal sufficiency of Plaintiff's Title VI claim. Plaintiff alleges that "MedStar engaged in intentional discrimination by allowing its security personnel to wrongfully remove Plaintiff from a federally funded medical facility without treatment, thereby subjecting her to differential treatment on the basis of race and gender." Dkt. 23 at 11 (Am. Compl. ¶ 47). Plaintiff references gender discrimination throughout her complaint and her Title VI allegations. *See*, *e.g.*, *id.* at 10–11 (Am. Compl. ¶¶ 42–47). Title VI, however, does not address sex discrimination, and Plaintiff raises no other statutes or causes of action that would permit her to challenge MedStar's alleged gender discrimination. But even treating her claim as limited to alleged discrimination based on her race, Plaintiff's Title VI claim fails.

Title VI prohibits discrimination on the basis of "race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). "What is necessary . . . for both constitutional and Title VI claims is a showing of *intentional* discrimination." *Smith v. Henderson*, 944 F. Supp. 2d 89, 100 (D.D.C. 2013) (emphasis in original); *see also Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("[I]t is similarly beyond dispute—and no party disagrees—that [42 U.S.C. § 2000d] prohibits only intentional discrimination.").

Plaintiff's complaint fails to allege any facts that might plausibly support an inference of discriminatory motive. Plaintiff alleges that she is an African American woman, and then asserts in entirely conclusory terms that she was "met with . . . racial . . . discrimination by MedStar's security personnel;" that Dzieketey's "violence and refusal to listen to Plaintiff's explanation as to why she was located in the room where he found her was motivated by discrimination against Plaintiff as an African-American woman;" that "Plaintiff was forcibly removed from the hospital . . . solely based on the discriminatory actions of MedStar;" and that "discriminatory conduct of MedStar personnel [was] evidenced by" Dzieketey's violent removal of Plaintiff from the hospital and MedStar's five-year barring notice. Dkt. 23 at 10–11 (Am. Compl. ¶¶ 42–46).

These allegations are far too conclusory to raise any plausible inference of discriminatory motive. Plaintiff's allegation that she was told to "get out" and was violently removed and banned from the hospital before she had an opportunity to explain, *see id.* at 6, 10–11 (Am. Compl. ¶¶ 22, 42–46), while troubling, does not suggest that any of Dzieketey's or MedStar's actions were racially motivated. Although Plaintiff claims she was "subject[] . . . to differential treatment on the basis of race," *id.* at 11 (Am. Compl. ¶ 47), she fails to offer any basis whatsoever to believe or infer that her mistreatment had anything to do with her race. "A legion of cases has held that the mere fact that an injured party happens to be a member of a certain racial minority group does not give rise to a reasonable inference of discriminatory treatment, and this principle is too well established to warrant explanation here." *Miller v. D.C. Water & Sewer Auth.*, No. 17-cv-0840, 2018 WL 4762261, at *14 (D.D.C. Oct. 2, 2018), *aff'd*, 790 F. App'x 218 (D.C. Cir. 2019).

Plaintiff's assertion that MedStar "lack[ed] . . . any legitimate, non-discriminatory justification" puts the cart before the horse. Dkt. 23 at 11 (Am. Compl. ¶ 46). Under the familiar

*McDonnell Douglas* burden-shifting framework, a plaintiff must first make out a *prima facie* case of racial discrimination by demonstrating that the defendant's actions were motivated by the plaintiff's race. Only then does the burden shift to the defendant to articulate a legitimate, non-discriminatory reason for its actions. Once the defendant puts forth such a reason, the burden shifts back to the plaintiff to demonstrate that the defendant's stated reason for its actions was in fact pretext for unlawful discrimination. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *see also Richardson v. Loyola College in Md.*, 167 F. App'x 223, 224 (D.C. Cir. 2005) (applying *McDonnell Douglas* framework to Title VI racial discrimination claims). Plaintiff is correct that she need not allege all the elements of a *prima facie* case in her complaint. Dkt. 34 at 5; *see Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000). But she must allege some facts—any facts—that permit an inference that Plaintiff's removal and barring from the hospital was motivated by her race; *ipse dixit* assertions that MedStar lacked "any legitimate non-discriminatory justification" for doing so does not suffice, Dkt. 23 at 11 (Am. Compl. ¶ 46). *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) ("[The Court] accept[s] neither inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations." (citation modified)). In any event, Plaintiff's contention is belied by her own allegations that MedStar (through Dzieketey) provided a legitimate non-discriminatory justification to MPD—that Plaintiff was not supposed to be in the room in which she was found. Dkt. 23 at 6 (Am. Compl. ¶ 23).

Plaintiff's Title VI claim against MedStar is, accordingly, dismissed.[1]

[1] Plaintiff's common law claims derive from the same "nucleus of operative fact" as her Title VI claim. *United Mine Workers v. Gibbs of Am.*, 383 U.S. 715, 725 (1966). Because the Court is

3. *Negligent Supervision, Hiring, and Retention*

Plaintiff's negligent supervision and negligent hiring and retention claims also fail as a matter of law. The Court considers these claims in tandem because similar principles apply to both. "Under D.C. law, an employer owes a duty to third persons, based on the conduct of its employees, to use reasonable care to select competent employees and to fire incompetent employees." *Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 127 (D.D.C. 2012) (citing *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007)). "If an employer neglects this duty, and a third person is harmed as a result, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of employment." *Id.* at 128–29 (citation omitted).

To state a claim for negligent supervision, a plaintiff must plausibly allege that "[the] employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Brown*, 782 A.2d at 760 (citation modified). "The ability to supervise or control [the employee's] behavior [is] a mandatory element of the negligent supervision tort." *Godfrey v. Iverson*, 559 F.3d 569, 573 (D.C. Cir. 2009). As

---

dismissing Plaintiff's only federal claim, and because the Court lacks diversity jurisdiction, *see* Dkt. 23 at 3 (Am. Compl. ¶¶ 7, 9), the Court "has the discretion to exercise—or decline to exercise—supplemental jurisdiction over any state-law claims that remain." *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 190 (D.D.C. 2018) (emphasis omitted); *see also Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011). Guiding that discretion are "[g]eneral equitable factors . . . including judicial economy, convenience, fairness, and comity." *Pollard v. District of Columbia*, 191 F. Supp. 3d 58, 82 (D.D.C. 2016) (citation modified). Here, exercising supplemental jurisdiction over Plaintiff's claims promotes judicial economy and convenience because it eliminates the need for a remand to state or local court to resolve simple legal questions whether the allegations contained in Plaintiff's complaint, accepted as true, state a claim under any of the well-established common law causes of action she raises. None of the state claims "raise[] . . . novel or complex issue[s] of [s]tate law." 28 U.S.C. § 1367(c)(1).

explained, "[t]o invoke this theory," a plaintiff may not rely on "the concept of *respondeat superior*" but must, instead, "allege[] . . . direct negligence." *Brown*, 782 A.2d at 760 (citation modified). Similarly, a claim for negligent hiring and retention is a "direct liability theory . . . distinct from negligence based on the vicarious-liability doctrine of *respondeat superior*," *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 229 (D.D.C. 2015). "[T]o state a claim for negligent hiring, a plaintiff must allege specific facts from which an inference can be drawn that the employer did not conduct a reasonable background investigation, and that such an investigation would have uncovered a reason not to hire the alleged tortfeasor." *Id.*

Here, both of Plaintiff's claims turn on (1) whether—and when—MedStar had actual or constructive knowledge of Dzieketey's or his supervisor's misconduct or (2) whether—and when—MedStar uncovered any reason not to hire or retain Dzieketey. MedStar contends that both claims should be dismissed because Plaintiff has not sufficiently alleged (1) that MedStar "had actual or constructive knowledge of Dzieketey's conduct" or (2) that MedStar "did not pre-screen Dzieketey or that such investigation would have uncovered a reason not to hire him." Dkt. 27-1 at 6–7. The Court agrees and concludes that "[a]part from buzzwords culled from the relevant law," Plaintiff's complaint "fails to allege facts suggesting that [MedStar] had any knowledge, actual or constructive, of" any employee's improprieties *before* Plaintiff's assault and removal. *Stevens*, 846 F. Supp. 2d at 128.

The Court starts with the negligent supervision claim. Plaintiff asserts that MedStar "negligently supervised . . . Dzieketey, his supervisor, and other security personnel," when Dzieketey "used unlawful force and physically removed Plaintiff from the hospital while she was seeking medical care," and when his supervisor "unlawfully bar[red] Plaintiff from the hospital for five years despite her clear need for emergency medical care." Dkt. 23 at 8–9 (Am. Compl.

¶ 33). She further alleges that "Defendant[] knew or should have known that their employees were acting negligently, recklessly, or unlawfully in the performance of their duties and failed to take appropriate corrective action." *Id.* at 9 (Am. Compl. ¶ 34).[2] But she alleges no facts that would support that contention. As for Dzieketey, Plaintiff does not allege that anyone else was present at the time of the alleged assault and removal or that anyone who was present "had either the power to control [Dzieketey's] conduct or the opportunity to alert someone who did have that power in time to prevent the harm." *Brown*, 782 A.2d at 760. Plaintiff only alleges that Dzieketey's supervisor "issued Plaintiff a five-year Barring Notice" *after* Dzieketey violently removed Plaintiff from the hospital and MPD responded to the situation. Dkt. 23 at 6 (Am. Compl. ¶¶ 23–24); *see also* Dkt. 34 at 7 (noting that "the supervisor was on site and responded to the scene after Plaintiff called 911 because of Dzieketey's conduct"). At most, these circumstances permit a plausible inference that the supervisor became aware of Dzieketey's misconduct shortly after it occurred. But it does not suggest that Dzieketey's supervisor knew or had constructive knowledge of Dzieketey's allegedly violent behavior or violent propensities "before the incident at issue here" or that she could have prevented it. *Jackson v. District of Columbia*, No. 25-cv-889, 2026 WL 890452, at *14 (D.D.C. Mar. 31, 2026) (citation modified);

[2] Plaintiff also references MedStar's "[f]ail[ure] to ensure that security personnel respected hospital policies and patient rights," Dkt. 23 at 9 (Am. Compl. ¶ 33), but Plaintiff has not brought a failure to train claim, and her response in opposition clarifies that her negligent supervision claim is about MedStar's "fail[ure] to supervise and control the conduct of its security officer, Dzieketey, despite signs of dangerous behavior," Dkt. 34 at 6. The amended complaint's "description of the duty," moreover, "cannot . . . rest on mere conclusory assertions." *Smith v. United States*, 157 F. Supp. 3d 32, 40 (D.D.C. 2016) (citation modified). Plaintiff has failed to offer any specific allegations about MedStar's training and supervision program, and she has not identified what "hospital policies" or "patient rights" were violated, or how failure to follow those policies or respect these rights constitutes a breach of a duty enforceable under D.C. tort law. She does not assert that any particular training in any specified hospital policy would have prevented her assault or her ban from the hospital. Accordingly, the Court need not further consider this theory of liability.

*see also Brown*, 782 A.2d at 760 (negligent supervision claim fails because there was no evidence "that a person with supervisory authority over [employee] saw what occurred or had an opportunity to stop it").

The same is true for Dzieketey's supervisor. As a preliminary matter, Plaintiff does not explain how the supervisor's issuance of the five-year barring notice constitutes "dangerous or otherwise incompetent" behavior. *Brown*, 782 A.2d at 760 (citation modified). Perhaps Plaintiff had nowhere else to turn for essential medical care, but, if so, she does not say so, and she alleges no facts to support that theory. Yet, even assuming the barring notice is actionable under a theory of negligent supervision, Plaintiff's amended complaint avers that the notice was issued by a "hospital security sergeant" but fails to allege that anyone with supervisory authority over the "hospital security sergeant" knew or should have known that she would bar (or even had barred) Plaintiff from the hospital and could have prevented her from doing so or could have remedied the error. Dkt. 23 at 6 (Am. Compl. ¶ 24). Nor, for that matter, does Plaintiff allege that she ever followed up (or ever attempted to follow up) with hospital management by explaining what had happened and asking that management rescind the notice or take any other action.

Plaintiff's negligent hiring and retention claim, which focuses on Dzieketey's conduct alone, fails for the same reason. Despite mentioning a "duty to conduct adequate background checks," *id.* at 12 (Am. Compl. ¶ 55), "Plaintiff does not allege that [MedStar] did not actually conduct a background check . . . prior to hiring [Dzieketey]," *Search*, 128 F. Supp. 3d at 230, or that any such background check would have revealed reasons not to hire him. She makes a general allegation that MedStar "was aware or should have been aware of . . . Dzieketey's propensity for violence[,] . . . that he posed a danger to patients and others, and [of] prior actions

or conduct that should have raised doubts about his suitability for his position." Dkt. 23 at 12–13 (Am. Compl. ¶ 56). But she fails to specify *how* MedStar might have been aware of such propensities or *what* "prior actions or conduct" might have put MedStar on notice of such propensities. *See, e.g.*, *Stevens*, 846 F. Supp. 2d at 128 ("Stevens does not allege what acts of theft Sodexo knew or should have known about."); *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 349 n.6 (D.C. 1987) (negligent hiring claim fails because there was "no evidence that the [employer] knew or should have known of any prior history of or tendency toward assaults by [employee]").

Plaintiff makes much ado of her allegations that Dzieketey appeared to be under the influence of illegal substances and was otherwise aggressive during their interactions. *See, e.g.*, Dkt. 34 at 6 ("Plaintiff alleges that Dzieketey appeared to be under the influence of illegal substances, exhibited erratic behavior, and violently removed her from the emergency department while she was seeking care after being the victim of an assault."); *id.* at 8 (noting that "excessive force, signs of intoxication or drug use, aggressive and threatening behavior" were "known indicators of Dzieketey's unfitness"); *see generally* Dkt. 23 at 6 (Am. Compl. ¶ 21). But Plaintiff's reliance on these indicators suffers from the same problem as her other allegations. Plaintiff cannot rely on the same allegedly tortious conduct giving rise to her claim to establish a plausible inference of the employer's prior knowledge: the employer's knowledge of the employee's proclivities must precede the employee's tortious acts. "The gravamen of Plaintiff's complaint seems to be that [MedStar's] hiring mechanisms [and supervision] *must* have been inadequate if they failed to uncover that [Dzieketey]" was a substance user or had an otherwise aggressive or violent demeanor. *Search*, 128 F. Supp. 3d at 230 (emphasis in original); Dkt. 23 at 6, 12 (Am. Compl. ¶¶ 21, 55). But even if Dzieketey appeared to be under the influence of

illegal substances and exhibited erratic behavior when he interacted with Plaintiff, that—standing alone—offers no basis to infer that Dzieketey exhibited a similar demeanor on prior occasions, much less that MedStar had any prior knowledge of any actual substance abuse or dangerous propensities by Dzieketey or that it could have uncovered any such abuse or propensities through a reasonable background investigation. As Chief Judge Boasberg has aptly observed, "this *res ipsa loquitur*-style logic falls short of the threshold required to survive a Rule 12(b)(6) motion." *Search*, 128 F. Supp. 3d at 230.

The Court will, accordingly, dismiss Counts I and III against MedStar.

4. *Negligent Infliction of Emotional Distress*

Finally, the Court turns to Plaintiff's NIED claim against MedStar. As explained above, a negligence claim involving the use of force by an officer "must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." *Chinn*, 839 A.2d at 711. Here, Plaintiff attempts to rely on the following three breaches of "distinct standard[s] of care:" MedStar permitted "security personnel to use excessive force against a vulnerable patient without justification or accountability;" MedStar failed "to ensure that security personnel followed hospital policies and respected patient rights;" and MedStar barred "Plaintiff from the hospital for five years, depriving her of access to necessary medical care." Dkt. 23 at 15–16 (Am. Compl. ¶ 70). The Court concludes that Plaintiff has failed to plead any of the required elements of NIED.

As a preliminary matter, "a claim for [NIED] requires an underlying negligence claim because [NIED] is predicated on the defendant's breach of a duty owed to the plaintiff." *E.M. v. Shady Grove Reprod. Sci. Ctr., P.C.*, No. 24-cv-956, 2025 WL 947515, at *13 (D.D.C. Mar. 28, 2025) (citing *Hedgepeth*, 22 A.3d at 810–11). In her response in opposition to MedStar's motion

to dismiss, Plaintiff clarifies that the "acts of omission" underlying her "negligent supervision and retention" claims "form the basis of her NIED claim." Dkt. 34 at 10. For the reasons explained above, however, Plaintiff's allegations do not provide a basis to conclude that MedStar was negligent in hiring, supervising, or retaining Dzieketey or his supervisor in carrying out their employment duties. That alone is fatal for Plaintiff's NIED claim. *See Shady Grove Reprod. Sci. Ctr., P.C.*, 2025 WL 947515, at *13 ("[T]here is no foundational duty or breach to support the [NIED] claim, leading to its dismissal by default."). But even beyond that difficulty, as explained above, Plaintiff's generalized allegations of "[a]nxiety, fear, and humiliation," "[p]sychological trauma and emotional suffering," "[o]ngoing distress," and "[a]ggravation of Plaintiff's life-threatening chronic condition," Dkt. 23 at 16 (Am. Compl. ¶ 72), fail to satisfy the requirement that she plead "serious and verifiable" emotional distress, *Hedgepeth*, 22 A.3d at 817 (citation modified), which must manifest in some physical or concrete symptoms, *Hawkins*, 311 F. Supp. 3d at 107.

Without any plausible allegations of breach or emotional damages, Plaintiff's NIED claim fails as a matter of law. The Court will, accordingly, dismiss Count V against MedStar.

## CONCLUSION

For the foregoing reasons, WMATA's motion to dismiss, Dkt. 26, is hereby **GRANTED**, and MedStar's motion to dismiss, Dkt. 27, is **GRANTED**.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 22, 2026